IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

BURTON JAMES KETTNER                                                    PLAINTIFF

V.                              Case No. 4:23-CV-00734-JM-BBM

SHARRON CASTLEBERRY, Jail
Administrator, Prairie County
Detention Facility; RICK PARSONS,
Sheriff, Prairie County, Prairie County
Detention Facility; RICK HICKMAN,
Former Sheriff, Prairie County, Prairie
County Detention Facility; and
BRAD GRADY, Former Administrator,
Prairie County Detention Facility                                       DEFENDANTS

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to

United States District Judge James M. Moody Jr. You may file written objections to all or

part of this Recommendation. If you do so, those objections must (1) specifically explain

the factual and/or legal basis for your objection; and (2) be received by the Clerk of this

Court within fourteen (14) days of the date of this Recommendation. If you do not file

objections, Judge Moody may adopt this Recommendation without independently

reviewing all of the evidence in the record. By not objecting, you may waive the right to

appeal questions of fact.

## I.    INTRODUCTION

On August 7, 2023, Plaintiff Burton James Kettner ("Kettner"), a pretrial detainee

then housed at the Prairie County Detention Facility ("PCDF"), filed a *pro se* § 1983

Complaint, alleging that Defendants violated his constitutional rights. (Doc. 2). An Amended Complaint and Second Amended Complaint followed. (Docs. 6, 8).

After the Court screened the Amended Complaint and Second Amended Complaint[1] in accordance with the Prison Litigation Reform Act, Kettner was allowed to proceed with deliberate-indifference claims against Defendants—PCDF Administrator Sharron Castleberry ("Castleberry"), Prairie County Sheriff Rick Parsons ("Sheriff Parsons"), former Prairie County Sheriff Rick Hickman ("Sheriff Hickman"), and former PCDF Administrator Brad Grady ("Grady")—for allegedly denying him medical care for his stage-four colon cancer, heart condition, and dental needs, among other issues. (Doc. 12 at 2). Kettner sues Defendants in their individual and official capacities, (Doc. 6 at 3).

On November 5, 2024, Defendants filed a Motion for Summary Judgment, a Brief in Support, and a Statement of Undisputed Facts, arguing that Kettner's claims fail on the merits. (Docs. 49–51). Kettner filed a Response, (Doc. 53), and Defendants filed a Reply and an Addendum, (Docs. 54–55). The Addendum appeared to be a single page of Kettner's deposition and new evidence that was not attached to Defendants' summary judgment filings. (Doc. 55 at 2). Thus, on December 12, 2024, the Court ordered Defendants to produce Kettner's entire deposition transcript and gave Kettner the opportunity to file a sur-reply. (Doc. 56). Defendants complied with the Order and filed an Addendum containing the entire deposition transcript, (Doc. 57), and Kettner filed a sur-

---

[1] Both the Amended Complaint, (Doc. 6), and the Second Amended Complaint, (Doc. 8), were served on the Defendants and were construed together as constituting Kettner's claims. *See* (Doc. 12) (screening Kettner's claims considering both documents).

reply. (Doc. 58). Thus, the issues are joined and ready for disposition. For the reasons set forth below, the Court recommends Defendants' Motion for Summary Judgment be granted.[2]

## II.    FACTUAL BACKGROUND[3]

Kettner was diagnosed with stage IV colorectal cancer in April 2017. (Doc. 42 at 221, 246; Doc. 57 at 30, 28:15–16). He underwent radiation therapy and chemotherapy, which required he have a heart port installed. (Doc. 42 at 167, 206, 231; Doc. 57 at 31, 29:2–3). He also used a colostomy bag. (Doc. 42 at 203; Doc. 57 at 16, 14:24–25).

In June 2017, Kettner developed a blood clot in his left arm and was prescribed a blood thinner, Eliquis. (Doc. 42 at 231–232). Kettner underwent surgery in August 2017, which successfully removed the cancer. (Doc. 42 at 167, 221; Doc. 57 at 18, 16:3–7). And in June 2018, he had his colostomy bag removed. (Doc. 42 at 160, 167; Doc. 57 at 16, 14:24–25). Even so, Kettner continued to suffer from stomach aches, pain, and problems controlling his bowel movements. (Doc. 42 at 140; Doc. 57 at 16–17, 14:25–15:2). And

---

[2] Summary judgment is appropriate when the record demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249–50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* FED. R. CIV. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). "Courts must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party." *Brand v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 934 F.3d 799, 802 (8th Cir. 2019) (citing *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 216 (2015)).

[3] With few exceptions, these facts are sourced from Defendants' summary judgment exhibits, which include Castleberry's affidavit and portions of Kettner's PCDF intake paperwork, grievances, and medical request forms, (Docs. 49-1 to 49-7); Kettner's deposition, (Doc. 57); an additional grievance attached to Kettner's sur-reply, (Doc. 58 at 6); Kettner's medical records, (Doc. 42); and, as necessary, Kettner's verified Complaints, (Docs. 6, 8).

the chemotherapy exacerbated Kettner's pre-existing dental problems, causing his teeth to rot and "hurt[] real bad." (Doc. 42 at 169–170; Doc. 57 at 15, 13:7–21 & 35–36, 33:23–34:1).

Kettner's heart port remained installed, and he was required to attend regular follow-up appointments with both his colorectal surgeon, Dr. William C. Mustain, and his oncologist, Dr. Omer Khalil, to make sure his cancer did not return. (Doc. 42 at 58–59, 167, 221; Doc. 57 at 18, 16:15–19). The follow-up appointments consisted of periodic PET/CT scans, colonoscopies, blood work, and port flushes. (Doc. 42 at 139–140, 160–161, 168). Kettner also continued take his blood thinner. (Doc. 42 at 106, 154, 161). Kettner generally maintained his follow-up appointments and took his medication as prescribed.[4] *See* (Doc. 42 at 73–174); (Doc. 57 at 20, 18:9–12). That is, until he was twice incarcerated in the PCDF. It is undisputed that Kettner did not receive any medical care during either of his PCDF incarcerations. *See* (Doc. 8 at 4; Doc. 49-3; Doc. 57 at 53, 51:16–19).

According to Kettner, he was first incarcerated at PCDF sometime after April 1, 2022. (Doc. 57 at 41–42, 39:22–40:13). Although there is no evidence regarding Kettner's first date of incarceration, the parties appear to agree that he was booked in on September 2, 2022. (Doc. 53 at 4, 23; Doc. 54 at 3). During the 2022 incarceration, the jail administrator was Grady, and the Prairie County Sheriff was Sheriff Hickman. (Doc. 57 at 42, 40:20–21 & 54, 52:21–25). There is not much record evidence of what occurred during

---

[4] In June 2021, it was noted that Kettner was taking his blood thinner "sporadically," and cancelled a colonoscopy appointment. (Doc. 42 at 106).

Kettner's first PCDF incarceration, but Kettner claims he filled out an "Inmate Medical form" and "was asking them for medical help and [] explained to each one of them that [he] needed to see [his] doctors" so he "could stay on top of everything." (Doc. 53 at 4; Doc. 57 at 54–55, 52:21–53:3).

Kettner bonded out in November 2022 and visited his oncologist, Dr. Khalil, on November 8, 2022, with complaints of abdominal pain. (Doc. 42 at 69–72; Doc. 53 at 23; Doc. 57 at 12, 10:6–13). Dr. Khalil noted that Kettner had been incarcerated, had not seen Dr. Mustain, and had "missed CT scans [that] will need to be rescheduled." (Doc. 42 at 69, 72). Blood work was conducted, which showed "mild and stable anemia." (Doc. 42 at 72). But there was "no clinical evidence of disease recurrence." (Doc. 42 at 72). Kettner was advised to schedule a consultation for pain management, "[c]ontinue regular follow up for Colorectal cancer," have a CT scan prior to his next visit, and return to the clinic in six months for repeat assessment and blood work. (Doc. 42 at 72).

But, before Kettner could continue his follow-up appointments, he missed a court date and was rebooked into PCDF on January 17, 2023. (Doc. 49-1 at 2; Doc. 49-6 at 2, ¶ 2; Doc. 57 at 11–12, 9:23–10:3). During the 2023 incarceration, the jail administrator was Castleberry, and the Prairie County Sheriff was Sheriff Parsons. (Doc. 57 at 42, 40:24–25 & 54, 52:1–3).

This time, Kettner filled out a medical intake questionnaire that is contained in the record. (Doc. 49-1 at 1). On the intake form, Kettner wrote the name of his family doctors, "Dr. Mustang and Dr. Kohkahaalil," and that he had anxiety, major dental problems, a meth addiction, colon cancer, and stomach problems. *Id.* Kettner answered "no" when

asked if he was taking medication or had any heart problems. *Id.* Kettner explained in his deposition that he was not on his blood thinners at that time and understood the question about "heart problems" to be asking about heart attacks and the like; thus, he did not disclose his prescription for Eliquis or that he had a heart port that needed flushed. (Doc. 57 at 26, 24:5–18 & 33–34, 32:3–9).

Regardless, Kettner revealed his medical needs to PCDF staff in other ways. Shortly after his January 2023 booking, Kettner began to submit paper medical requests and verbally request help. (Doc. 57 at 49–50, 47:21–48:5). At some point, he told "them" that he was having pains in his chest, similar to his previous blood clot, and needed his blood thinner. (Doc. 57 at 33–34, 31:17–32:4). Another unspecified time, Kettner was having bowel movements that he could not control, but no one would provide him an anti-diarrheal. (Doc. 57 at 52, 50:3–10). But, despite Kettner's verbal and written requests for help, he never received any help or response. (Doc. 57 at 49, 47:21–25).

So, on July 29, 2023, Kettner submitted his first grievance on the digital kiosk. (Doc. 8 at 4; Doc. 57 at 37–38, 35:23–36:3 & 39, 37:7–9). Additional grievances followed on August 3, 12, 15, 27, 31 and September 5, 17, 2023. (Doc. 51 at 2, ¶ 3). As the jail administrator, Castleberry viewed and responded to the grievances. *See* (Doc. 49-2 at 2; Doc. 49-3 at 2; Doc. 58 at 6).

Only portions of the grievances are contained in the record, (Doc. 58 at 6; Doc. 49-2 at 2; 49-3 at 2), but Kettner testified as to the content of each grievance during his deposition. (Doc. 57 at 39–48, 37:1–46:6). Kettner grieved that, despite telling "staff," "medical," and "everyone" that he had colon cancer and needed his port flushed once a

month, a PET scan once a year, and blood work done, he had not been receiving medical care for his colon cancer and dental issues. (Doc. 49-2 at 2, Doc. 58 at 6). He lamented that his requests to see a dentist had been ignored and that he had to pull several of his own teeth. (Doc. 58 at 6). He also wrote that he was "in constant pain and worried about [his] health." *Id.* Castleberry generally responded that she would put Kettner on the list to be seen by the doctor but explained that Kettner would need to fill out a medical release form to receive medical treatment. (Doc. 49-2 at 2; Doc. 49-3 at 2; Doc. 49-6 at 3, ¶¶ 5, 9; Doc. 57 at 40, 38:11–15 & 41, 39:1–24 & 44, 42:12–21 & 46–47, 44:15–45:15; Doc. 58 at 6).

Kettner testified that he repeatedly asked for the medical release form "from day one," so he could receive treatment, and that it is usually the jail administrator's responsibility to get the form to the inmates. (Doc. 57 at 44–45, 42:17–43:5). In fact, when he asked for the form, several PCDF guards told Kettner that "they had to ask Ms. Castleberry." (Doc. 57 at 45–46, 43:12–44:7). But he did not receive the form until "Mrs. Taylor" brought it to him on September 6, 2023, when he immediately signed it. (Doc. 53 at 6, 28; Doc. 57 at 38, 36:11–13). But Defendants argue that Castleberry and the previous PCDF jail administrator, Grady, are not "responsible for making an inmate sign the medical release form." (Doc. 50 at 6). Castleberry also states in her affidavit that Kettner's access to medical care was only delayed because of Kettner's "failure to sign the medical release form" until September 20, 2023. (Doc. 49-6 at 3, ¶¶ 8–9).

On September 19, 2023, Kettner was sentenced to the ADC. (Doc. 8 at 4). On September 26 & 28, 2023, Castleberry filled out a medical evaluation request to the PCDF medical care provider and tried to "fast-track" Kettner to the ADC to receive care. (Doc.

49-4 at 2–3; Doc. 49-5 at 2; Doc. 57 at 50, 48:20–24). Kettner was transferred to the ADC on October 5, 2023. (Doc. 49-6 at 3–4, ¶ 10). The ADC began flushing Kettner's port, and, on October 10, 2023, took him to see Dr. Khalil. (Doc. 57 at 58, 46:22–25; Doc. 42 at 65–68).

At the October 10, 2023 appointment, Dr. Kahlil noted that Kettner was incarcerated, had been "lost to follow up" since November 2022, had not received the repeat CT scans as advised, and had not had a colonoscopy since January 2022. (Doc. 42 at 68). Kettner complained of stomach discomfort, but reported a good appetite, weighed 15 pounds more than his last visit, and his immediately reviewable blood work showed "normal counts." (Doc. 42 at 65, 68). Dr. Kahlil noted there was "no clinical evidence of disease recurrence" and recommended that Kettner receive CT scans, continue regular follow-up care, and return in six weeks for additional blood work. (Doc. 42 at 68).

Kettner received CT scans on November 14, 2023, and followed up with Dr. Kahlil on November 21, 2023. (Doc. 42 at 63). Dr. Kahlil noted that Kettner's CT scans also showed "no evidence of regional or recurrent disease." (Doc. 42 at 63). Dr. Kahlil instructed Kettner to continue with regular follow-up appointments and to return to the clinic every eight weeks to have his port flushed and repeat blood work. (Doc. 42 at 63).

Kettner had at least one more visit with Dr. Khalil while incarcerated—again showing "no clinical evidence of disease recurrence"—and, in June 2024, Kettner was released from ADC custody. (Doc. 42 at 51–55; Doc. 39). As of his September 30, 2024 deposition, Kettner still had not seen a dentist but planned on getting dentures because it was "too late" to get any other work done. (Doc. 57 at 15, 13:10–14 & 16, 14:4–14).

### III.    DISCUSSION

Defendants argue that they are entitled to qualified immunity. (Doc. 50 at 12–14). According to Defendants, Kettner cannot establish any Defendant deprived him of his constitutional rights because "the acts about which [Kettner] complains show that none of them demonstrate a deprivation of a constitutional right." (Doc. 50 at 14). Similarly, Defendants argue that the record does not contain a supervisory constitutional violation. *Id.* at 10–12.

### A.    Individual-Capacity Claims: Qualified Immunity

Qualified immunity protects a government official from liability when his or her conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine if Defendants are entitled to qualified immunity, the Court must conduct a two-pronged inquiry into whether Kettner has demonstrated: "(1) a deprivation of a constitutional right, [that was] (2) … clearly established at the time of the deprivation." *Robbins v. City of Des Moines*, 984 F.3d 673, 678 (8th Cir. 2021). Defendants are entitled to qualified immunity should either prong be decided in their favor. *Watson v. Boyd*, 2 F.4th 1106, 1112 (8th Cir. 2021) (citations omitted). The Court has discretion on which prong to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because this case turns on whether a constitutional violation occurred, the Court's analysis begins and ends with that prong.

Although Kettner was a pretrial detainee for most of his time at PCDF, the Court nevertheless analyzes his claims under the Eighth Amendment "deliberate-indifference

standard." *See Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (applying the deliberate-indifference standard to a pretrial detainee's claim of failure to provide medical care in violation of the due process clause of the Fourteenth Amendment). To prevail on his medical-deliberate-indifference claims, Kettner must establish that (1) he had "an objectively serious medical need," and (2) Defendants "knew of and disregarded that need." *Redmond v. Kosinski*, 999 F.3d 1116, 1119 (8th Cir. 2021) (quoting *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). "To constitute an objectively serious medical need or a deprivation of that need, the need or the deprivation alleged must be either obvious to the layperson or supported by medical evidence, like a physician's diagnosis." *Cannon v. Dehner*, 112 F.4th 580, 586 (8th Cir. 2024) (cleaned up), *cert. denied*, 145 S. Ct. 1149 (2025). Moreover, Kettner must show "not only that his condition is serious, but also urgent—one that 'may produce death, degeneration, or extreme pain.'" *Dalen v. Harpstead*, 123 F.4th 900, 904 (8th Cir. 2024) (quoting *Carney v. Hess*, 2007 WL 9752816 (E.D. Mo. Jan. 24, 2007), *aff'd*, 271 F. Appx. 543 (8th Cir. 2008)).

To establish deliberate indifference, there must be evidence suggesting Defendants "recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Shipp v. Murphy*, 9 F.4th 694, 703 (8th Cir. 2021) (quoting *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015)). As the Eighth Circuit has held:

> The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of more . . . than gross negligence. It requires a

mental state akin to criminal recklessness. Even medical malpractice does not automatically constitute deliberate indifference.

*Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016) (cleaned up). Relatedly, "inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment[.]" *Meuir v. Greene Cty. Jail Emps.,* 487 F.3d 1115, 1118 (8th Cir. 2007) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)). Thus, a "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Estate of Rosenberg v. Crandell,* 56 F.3d 35, 37 (8th Cir. 1995)). In sum, Kettner may prove deliberate indifference by "showing grossly incompetent or inadequate care, showing a defendant's decision to take an easier and less efficacious course of treatment, or showing a defendant intentionally delayed or denied access to medical care." *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015) (cleaned up). Because Kettner alleges that he has multiple serious medical needs, the Court will first analyze each need before discussing whether Defendants were deliberately indifferent.

Defendants may be held liable if they were personally involved in deliberately disregarding Kettner's serious medical needs, *see Wever v. Lincoln Cnty., Nebraska*, 388 F.3d 601, 606 (8th Cir. 2004), *i.e.* they may be held liable if they, themselves, denied Kettner adequate medical care. However, as the Eighth Circuit has held, "[a] supervisor may be liable under section 1983 if their failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Davis v. Buchanan Cnty., Missouri*, 11 F.4th 604, 624 (8th Cir. 2021) (cleaned up).

To prove a supervisory-liability claim, Kettner "must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts. This requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Wever*, 388 F.3d at 606 (quoting *Andrews v. Fowler,* 98 F.3d 1069, 1078 (8th Cir. 1996); *see also Davis,* 11 F.4th at 624 ("When a 'supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts.'") (quoting *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015)). "This 'rigorous standard' requires proof that the 'supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right.'" *Id.* (quoting *Krigbaum*, 808 F.3d at 340). Put differently, a supervisor is deliberately indifferent if he facilitates, condones, or turns a blind eye to the violative conduct of his subordinates. *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995).

### 1.    Serious Medical Needs

<u>Heart Port and Blood Thinners</u>. Kettner testified that (1) his heart port, placed by Dr. Mustain, needed to be flushed once a month for blood clots, and (2) before his incarceration, Dr. Khalil had prescribed him a blood thinner to prevent any blood clots related to the port. (Doc. 57 at 36, 34:13–18). The Court assumes that the flushing of Kettner's heart port is part of a doctor's treatment plan. And, according to Kettner, the blood thinner was prescribed by Dr. Khalil to prevent any further blood clots. Thus, the

Court finds that both issues constitute serious medical needs, *i.e.*, treatments following from a doctor's diagnosis.

Colon Cancer. To be clear, the record contains no evidence that Kettner suffered a recurrence of colon cancer during his time at the PCDF. Indeed, Kettner testified that a surgery in 2017 successfully removed his colon cancer. (Doc. 57 at 18, 16:3–10). However, Kettner did testify that he should have a PET scan or colonoscopy every six months, presumably to monitor any recurrence. (Doc. 57 at 35, 33:16–17). To extent that the possibility of a recurrence of cancer *could* constitute a serious medical need, the Court will proceed under this assumption when analyzing Kettner's claims related to the lack of PET scans and colonoscopies during his first incarceration (September 2, 2022–November 2022) and his second incarceration (January 17, 2023–October 5, 2023).

Dental Needs. The Court finds that Kettner's three "rotting" and painful teeth constituted a serious medical need. *See e.g.*, *Boyd*, 47 F.3d at 969 (concluding that a three-week delay in dental care, coupled with knowledge that an inmate is suffering, can support a finding of an Eighth Amendment violation); *Patterson v. Pearson*, 19 F.3d 439, 440 (8th Cir. 1994) (per curiam) (reversing grant of summary judgment where there was evidence that dentist learned of plaintiff's tooth-related swelling, headache, and severe pain in March but did not remove tooth until April); *Moore v. Jackson*, 123 F.3d 1082, 1086–87 (8th Cir. 1997) (per curiam) (denying summary judgment to defendants who delayed adequate treatment for a toothache for eight months that became infected and ultimately required extraction); *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004) (finding plaintiff's extreme dental pain, bleeding gums, swelling, and difficulty sleeping or eating constituted

a serious medical need). The Court notes that Kettner provides *no dates* associated with this serious medical need.

<u>Anti-diarrheal</u>. Although it is not mentioned in his Amended Complaints, Kettner testified that—on unspecified dates—he had bowel movements that he could not control, and no one would provide him an anti-diarrheal. (Doc. 57 at 52, 50:3–10, 16–18, 20). The Court finds that it is obvious to a layperson that out-of-control bowel movements require medical attention. Thus, the Court finds that—to the extent Kettner experienced accidents related to his bowel movements—this constituted a serious medical need.

### 2. Deliberate Indifference

Before analyzing whether each Defendant was deliberately indifferent, a recitation of Kettner's "group" assertions is necessary. All in all, Kettner ascribes the following actions to a vague "group," which may or may not consist of the Defendants.

In both of his operative Complaints, Kettner vaguely alleges that the "administration" has been aware of his medical needs from the first day he was booked in. (Doc. 6 at 5; Doc. 8 at 3). In his First Amended Complaint, Kettner adds that he told "them" about his teeth falling out. (Doc. 6 at 5). Kettner also testified that he had diarrhea and accidents, but no one would provide an anti-diarrheal. (Doc. 57 at 52, 50:3–10, 16–18, 20). Additionally, Kettner testified that he asked "them" for the medical release forms from the moment he was booked in, but no one would give him the forms. (Doc. 57 at 38, 36:6–7). The analysis below incorporates these "group" allegations, as well as the individual allegations against certain Defendants.

<u>Former Sheriff Rick Hickman</u>. A thorough review of the record reveals that there is *no evidence* (aside from vague and blanket assertions of fact) that former Prairie County Sheriff Hickman knew about Kettner's serious medical condition. In fact, there is little to no record evidence *at all* regarding Kettner's three-month incarceration at PCDF in 2022 when Sheriff Hickman and Administrator Grady were there.

In his Second Amended Complaint, as to Sheriff Hickman, Kettner alleges that he was Jail Administrator Grady's boss and, "I feel he know[s] what was going on in his jail and did not help me! I put in medical requests and never got any help or answers[.]" (Doc. 8 at 5). In his deposition, Kettner testified about Sheriff Hickman:

> **Q:** Do you believe that Rick Hickman intentionally ignored you and your medical condition?
>
> **A:** Yes, ma'am, I do.
>
> **Q:** And do you believe that he was responsible for your medical conditions while at Prairie County?
>
> **A:** Yes.
>
> **Q:** And was he responsible for making you sign a medical release form?
>
> **A:** Yes, ma'am.
>
> **Q:** Rick Hickman, at that time he was the former Sheriff of Prairie County. Now, was that your time in April?
>
> **A:** Yes, ma'am. And I was asking them back when Brad Grady was the Administrator and everything, I was asking them for medical help and I explained to each one of them that I needed to see my doctors, that way I could stay on top of everything.[5]

---

[5] Throughout this Recommendation, the deposition excerpts are copied word for word without removing grammatical errors.

(Doc. 57 at 54, 52:12–53:3). In combination, for the following reasons, these vague statements do not amount to evidence that Sheriff Hickman (1) knew of Kettner's serious medical needs, and (2) was deliberately indifferent towards them.

First, as to Kettner's allegation that the "administration" has been aware of his medical needs from his first day at PCDF, this assertion is far too vague to provide evidence for his claim against Sheriff Hickman. (Doc. 6 at 5; Doc. 8 at 3). As the Court noted in its initial screening order:

> Kettner does make allegations against the "Administration." But this general term is not specific enough for the Court to understand which Defendant knew of, but ignored, his serious medical needs. Without specific allegations against a Defendant, the Court cannot determine if a Defendant's actions may have been unlawful. *See Iqbal*, 556 U.S. at 676 (explaining that, to state a viable § 1983 claim, a prisoner "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"). As such, Kettner's Complaint as currently pled fails to state a claim on which relief may be granted.

(Doc. 6 at 5; Doc. 8 at 3). When this Court granted Kettner the opportunity to amend, the Court expressly reminded Kettner that any amended pleading should (1) provide a description of each Defendant's individual actions that allegedly violated his constitutional rights, and (2) explain *how* the Defendants knew about Kettner's serious medical needs. (Doc. 4 at 4). Kettner's general assertions against the "administration" are insufficient.

Second, while Kettner asserts that he told "them" about his teeth falling out, (Doc. 6 at 5), this assertion is also far too vague. The same goes for Kettner's assertions regarding the anti-diarrheal. (Doc. 57 at 52, 50:3–10, 16–18, 20). In fact, at basic level, Kettner failed to tie the dental and bowel movement allegations to *any dates* or *any party*. Kettner's

statement that "they" never brought him the medical release forms suffers the same fate—no dates or named parties are implicated.[6] (Doc. 57 at 38, 36:6–10).

Kettner's specific assertions against Sheriff Hickman fare no better. Kettner's claim that Sheriff Hickman was Administrator Grady's boss, and his feeling that Sheriff Hickman knew what was going on "in his jail" and did not help, again, are far too vague. Consequently, Kettner fails to identify any individual actions taken by Sheriff Hickman that violated Kettner's constitutional rights. Finally, while Kettner testified that he "explained to each one of them [presumably, Sheriff Hickman and Grady] that I needed to see my doctors, that way I could stay on top of everything," this statement fails to identify *when* Kettner told them, *what* doctors he requested to see, and in reference to *what* medical need.[7]

These few assertions in his Complaints and deposition represent the entirety of Kettner's "direct deliberate-indifference" evidence against Hickman. Unfortunately, both Kettner's allegations *and* his testimony lack the factual enhancement necessary to prove a constitutional violation. Even drawing all inferences in Kettner's favor, on this record, Sheriff Hickman is entitled to qualified immunity. Kettner's direct deliberate-indifference claims against Sheriff Hickman should be dismissed.

To be sure, Kettner could be proceeding on a supervisory-liability deliberate-indifference claim separate from his direct deliberate-indifference claim. Specifically,

---

[6] To the extent Kettner asked Castleberry for the medical release forms and she did not provide them, this allegation will be addressed alongside Kettner's other specific allegations against Castleberry.

[7] Given the context of this testimony, the Court assumes that "each one of them" refers to both Sheriff Hickman and Grady. (Doc. 57 at 54–55, 52:24-53:3).

Kettner asserts that he feels "[Sheriff Hickman] know[s] what was going on in his jail and did not help me!" (Doc. 8 at 5). However, in this case, without more information regarding (1) *how* Sheriff Hickman knew about Kettner's medical needs, (2) *when* Sheriff Hickman learned about his medical needs, or (3) *what* medical needs Sheriff Hickman knew about, Kettner cannot prove that Sheriff Hickman facilitated, condoned, or turned a blind eye to Kettner's serious medical needs. Without evidence of a supervisory constitutional violation, Sheriff Hickman is entitled to qualified immunity. Kettner's claims against Sheriff Hickman should be dismissed.

Former Jail Administrator Brad Grady. As with Sheriff Hickman, a careful review of the record reveals that there is *no evidence* (aside from vague and blanket assertions of fact) that former Jail Administrator Brad Grady knew about Kettner's serious medical condition. In his Second Amended Complaint, Kettner asserts that Grady "was aware of my medical need, and [he] did not get me any help, or did not take me to see any of my cancer [doctors] or get me any help, for medical, or dental!" (errors in original). (Doc. 8 at 5). Kettner further asserts that he put in medical requests and never got any help or answers. *Id.* Kettner testified about Grady as follows:

> **Q:** And do you believe Brad Grady intentionally ignored you and your medical needs?
>
> **A:** Yes, I do.
>
> **Q:** And was he responsible for your medical needs during Prairie County?

**A:** Yes, ma'am. He was the Administrator and he knew that I had—had it
and he didn't pay it no attention.

(Doc. 57 at 55, 53:4–10). In combination, these conclusory statements do not amount to

evidence that Brad Grady (1) actually knew of Kettner's serious medical needs, and (2)

was deliberately indifferent towards them.

As the Court found above, Kettner's general allegations against the "administration"

cannot support his claims against Grady. Similarly, Kettner's specific assertions against

Grady are also lacking. Although Kettner says he submitted multiple grievances and never

got any help or answers, (Doc. 8 at 5), Kettner fails to identify or produce any grievance

putting Grady on notice of Kettner's medical needs. Without more, Kettner cannot prove

*what* Grady knew and *when.* Kettner also testified that he "explained to each one of them

[presumably, Sheriff Hickman and Grady] that I needed to see my doctors, that way I could

stay on top of everything," but again, this statement fails to identify *when* Kettner told

them, *what* doctors he requested to see, and in reference to *what* medical need. For these

reasons, Grady is entitled to qualified immunity as to Kettner's direct deliberate-

indifference claim.

To the extent that Kettner proceeds on supervisory-liability deliberate-indifference

claims against Grady, those claims also fail. Kettner testified that Grady "was the

Administrator and he knew that I had—had it and he didn't pay it no attention." (Doc. 57

at 55, 53:9–10). However, in this case, without more information regarding (1) *how* Grady

knew about Kettner's medical needs, (2) *when* Grady learned about his medical needs, or

(3) *what* exact medical needs Grady knew about, Kettner cannot prove that Grady

facilitated, condoned, or turned a blind eye to Kettner's serious medical needs. As such, Grady is entitled to qualified immunity on any supervisory liability claims, as well.

Sheriff Rick Parsons. Kettner's claims against Sheriff Rick Parsons arose during his second incarceration in PCDF in 2023. In his Second Amended Complaint, Kettner asserts that "Rick Parsons is the new Sheriff of [PCDF]. I have put in medical requests and grievances. Have not received any answers or help! And when I asked to speak with the Sheriff, Mrs. Castleberry said he does not talk to the inmates!" (Doc. 8 at 5). Kettner further asserts that he sent three grievances with attention to the Sheriff: one on July 29, 2023, another on August 3, 2023, and a final grievance on August 7, 2023. *Id.* at 4. Kettner further testified:

> **Q:** And so at the time Rick Parsons, he was the sheriff of Prairie County?
>
> **A:** Yes, ma'am.
>
> **Q:** And so was the sheriff responsible for making you sign the medical release form?
>
> **A:** Well, they should see to it that I get it, at least where I could sign it. He should know what's going on in his jail, I would think.

(Doc. 57 at 54, 52:1–8). Upon review in a light most favorable to Kettner, these general claims do not amount to evidence that Sheriff Parsons (1) knew of Kettner's serious medical needs, and (2) was deliberately indifferent towards them.

Although Kettner says he submitted multiple medical requests alongside three grievances directed at Sheriff Parsons, (Doc. 8 at 5), the record is devoid of any grievance or medical request putting Sheriff Parsons on notice of Kettner's medical needs. In fact, Kettner testified that when he asked to speak with Sheriff Parsons, Castleberry said he does

not talk to the inmates. (Doc. 8 at 5). Castleberry's statements, as alleged by Kettner, would seem to confirm Sheriff Parsons's lack of knowledge of, or deliberate indifference to, Kettner's serious medical needs. Based on the record before the Court, Sheriff Parsons is entitled to qualified immunity as to Kettner's direct deliberate-indifference claim.

Regarding Kettner's supervisory liability deliberate-indifference claims against Sheriff Parsons, Kettner testified that, with respect to the medical release form, "they [presumably, Sheriff Parsons] should see to it that I get it, at least where I could sign it. He should know what's going on in his jail, I would think." (Doc. 57 at 54, 52:6–8). But again, although Kettner alleges that he sent grievances to Sheriff Parsons on certain dates, Kettner does not detail the content of those medical grievances. (Doc. 8 at 4). Without more information regarding Sheriff Parsons's knowledge, Kettner cannot prove that Sheriff Parsons facilitated, condoned, or turned a blind eye to Kettner's serious medical needs. *Boyd*, 47 F.3d at 968. And, without evidence of a constitutional violation, Sheriff Parsons is entitled to qualified immunity. Kettner's claims against Sheriff Parsons should be dismissed.

Jail Administrator Sharron Castleberry. Unlike the other Defendants, evidence in the record shows that Castleberry was at least somewhat involved in Kettner's care during his 2023 incarceration at PCDF. But whether proceeding directly against Castleberry on a medical-deliberate-indifference claim or against her in her supervisory capacity, the evidence must show some sort of awareness—either that Castleberry "knew of" Kettner's serious medical needs or "had notice" that her subordinates were being deliberately indifferent to Kettner's serious medical needs. *Davis,* 11 F.4th at 624.

It is undisputed that Kettner interacted with Castleberry through the grievance process from July 2023 until his transfer in October 2023. *See e.g.*, (Doc. 49-2–49-3; Doc. 57; Doc. 58 at 6). There is no evidence, however, of any involvement by Castleberry in Kettner's medical care prior to Kettner's July 29, 2023 grievance; accordingly, the Court focuses on Castleberry's actions from July 29, 2023 to the time Kettner was transferred to the ADC on October 5, 2023. Fact questions abound.

First, because neither party attached the full grievance history, it is difficult to determine exactly what information was conveyed to Castleberry and when. But, perhaps more important is the dispute regarding the medical release form. Defendants argue that any delay in Kettner receiving medical services was Kettner's own fault. According to Defendants, PCDF inmates "must sign a medical release form" in order to receive medical care, and a "failure to sign such medical release will result in the prolonging of medical services." (Doc. 50 at 6). They point out that Castleberry told Kettner of this requirement on several occasions, yet Kettner failed to follow the "proper practice" and "failed to sign a medical release form until September 20, 2023." *Id.* at 8. Without explaining how a PCDF inmate is supposed to obtain the medical release form, or including any supporting evidence, Defendants assert that Castleberry was not "responsible for making an inmate sign the medical release form." (Doc. 50 at 6; Doc. 54 at 4). After Kettner "finally" signed the form, Castleberry "[a]ttentively" submitted a medical request form to the PCDF medical provider and the ADC on September 26, 2023. (Doc. 50 at 8; Doc. 49-6 at 3, ¶¶ 9–10).

But Kettner testified that he repeatedly asked for the medical release form "from day one," and that it is usually the jail administrator's responsibility to get that form to the inmates. (Doc. 57 at 44–45, 42:17–43:5). He also testified that he asked several PCDF guards for the form, but they told Kettner that "they had to ask Ms. Castleberry." (Doc. 57 at 45–46, 43:12–44:7). Ultimately, Kettner received the form from "Mrs. Taylor" on September 6, 2023, and he signed it that day.[8] (Doc. 53 at 6, 28; Doc. 57 at 38, 36:11–13). If Kettner signed the medical release form on September 6, 2023, Castleberry's submission of medical evaluation forms on September 26, 2023, was perhaps not so "attentive." Moreover, on these murky facts, a jury might find that Castleberry should have (or at least *could* have) gotten the medical release form to Kettner sooner and curbed the alleged delay in medical care.

It could also be inferred from the record that Kettner's access to medical care was being delayed for non-medical reasons, such as Kettner's imminent transfer to the ADC. *See Dantzler v. Baldwin*, 133 F.4th 833, 847 (8th Cir. 2025) ("We have recognized that a prison official delaying medical treatment for nonmedical reasons may amount to deliberate indifference.") (cleaned up). Indeed, Kettner testified: "Once I was finally going to the ADC, then they finally wanted to go ahead and let me sign the papers." (Doc. 57 at 38, 36:16–18). He believes he was finally provided the medical release form approximately

---

[8] In support of his assertion that he signed the form on September 6, 2023, Kettner submits a handwritten document that states: "Today i signed my medicial Release forms for my cancer Doctors Release September 6th." (Doc. 53 at 6) (errors in original). The document appears to be signed by a "D. Taylor." *Id.* Kettner also testified that he signed the form on September 6. (Doc. 57 at 38, 36:11–14). But, during a series of leading questions, Kettner also testified that he did not sign the form until September 20, 2023. *Id.* at 48, 46:7–13.

two days before he was sentenced. *Id.* at 36:11–14. And Castleberry states that she "fast-tracked" Kettner to the ADC to receive medical care. (Doc. 49-6 at 3–4, ¶ 10; Doc. 54 at 5); *see also* (Doc. 49-4 at 3; Doc. 49-5 at 2).

Despite these fact questions and the dispute between the parties regarding who or what caused Kettner's delay in medical care, Castleberry is still entitled to qualified immunity. That is because, in order to establish a constitutional violation based on a delay in medical care, Kettner "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Dantzler*, 133 F.4th at 843 (citations omitted). In other words, Kettner must show, with medical records, that the delay in medical treatment adversely affected his cancer prognosis, exacerbated his conditions, or otherwise caused him harm. *Id.* Kettner placed medical evidence in the record, (Doc. 42), but the records do not reveal any detrimental effect based on the alleged delay in medical care. To the contrary, once Kettner was finally able to get his bloodwork done and receive a CT scan, Dr. Khalil found "no clinical evidence of disease recurrence." (Doc. 42 at 54, 63, 68).

There is also no medical evidence showing that a delay in Kettner having his port flushed caused any detrimental effect. Kettner testified that, when he was in PCDF, he "was having real bad chest pains where [his] port was…[that] felt like when [he] had [his] blood clot." (Doc. 57 at 51, 49:13–15). He also testified that, after he eventually had his port removed post-incarceration, his blood pressure got higher. (Doc. 57 at 22, 20:17–20). And when asked specifically about whether the delay in receiving a PET scan worsened his condition, Kettner testified, "I think it could have helped with my port and everything,

you know." (Doc. 57 at 53, 51:1–2). But "self-reported assertions of pain" must be supported by corroborating medical or expert evidence, *Hancock v. Arnott*, 39 F.4th 482, 487 (8th Cir. 2022), and none of the medical records provided by Kettner show any evidence of a second blood clot.

As for the lack of dental care, Kettner claims that he had to pull three teeth with his fingers while in PCDF, and he was willing to send those teeth to the Court as evidence. (Doc. 6 at 5; Doc. 33). But even after he was released from ADC custody, Kettner had not yet seen a dentist. (Doc. 57 at 16, 14:4–14). And he provides no medical evidence in support of his dental claims. Moreover, by the time Kettner filed a grievance to Castleberry asking to see a dentist on August 15, 2023, the teeth had already been pulled. (Doc. 58 at 6). Given Castleberry's lack of awareness of Kettner's dental complaint, her actions (or lack thereof) cannot be correlated to Kettner's loss of teeth.

In sum, Kettner has not shown that Sheriff Parsons, Sheriff Hickman, or Grady were directly involved in denying him medical care or even aware of his serious medical needs. Although Castleberry became aware of Kettner's medical needs in late July 2023, Kettner has not shown that any subsequent delay in receiving medical treatment was detrimental to his health. Accordingly, Kettner has failed to show Defendants violated his constitutional rights, and Defendants are entitled to qualified immunity in their individual capacity.

## B.    Official-Capacity Deliberate-Indifference Claims

To the extent Kettner proceeds against Defendants in their official capacities, those claims are the equivalent of claims against their employer, Prairie County. *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). But, because there is no

evidence of an underlying constitutional violation, the official-capacity claims fail as a matter of law. *Whitney v. City of St. Louis*, *Missouri*, 887 F.3d 857, 860 (8th Cir. 2018).

## IV.    CONCLUSION

IT IS THEREFORE RECOMMENDED THAT:

1.    Defendants' Motion for Summary Judgment, (Doc. 49), be GRANTED.

2.    Kettner's First Amended Complaint and Second Amended Complaint be DISMISSED with prejudice.

3.    Judgment be entered accordingly.

DATED this 19th day of August, 2025.

_____
UNITED STATES MAGISTRATE JUDGE